# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON, )
            ) No. 68536-8-I
         Respondent, )
            ) DIVISION ONE
        v. )
            ) UNPUBLISHED OPINION
ANTHONY ARCHULETA JR., )
            )
        Appellant. ) FILED: June 16, 2014
            )

APPELWICK, J. — Anthony Archuleta Jr. and his sister, Velia, entered the apartment of Rodriguez and repeatedly shouted at her "[W]hy you calling us a snitch?" while Velia physically assaulted her. Anthony was convicted as an accomplice to first degree burglary. He argues that evidence of gang membership and culture was improperly admitted. He also argues that officer testimony invaded the province of the jury. We affirm.

## FACTS

On August 31, 2011, the State charged Anthony Archuleta Jr. and Velia Archuleta[1] with first degree burglary. The information alleged that on August 5, 2011, Anthony and Velia unlawfully entered the apartment of Vanessa Rodriguez and assaulted her.

The information described Velia as the primary aggressor—pinning Rodriguez up against the wall and punching her multiple times. The information alleged that Anthony assisted Velia in assaulting Rodriguez by his words and acts of encouragement. The certification of probable cause stated that, during the assault, both Anthony and Velia

---

[1] We refer to the co-defendants by their first names to avoid confusion. They are brother and sister. Their father, Anthony Archuleta Sr., is also discussed in the case. We refer to him as Archuleta Sr.

Velia and Anthony are confirmed members of the Rancho San Pedro (RSP) gang in Auburn, Washington.

Before trial, the State sought to add a gang aggravator, alleging that Velia and Anthony committed the burglary "with the intent to directly or indirectly cause any benefit, aggrandizement, gain, profit, or other advantage to or for a criminal street gang as defined in RCW 9.94A.030, its reputation, influence, or membership." RCW 9.94A.535(3)(aa); 11/29 RP 8, 11-12.

The State also sought to admit gang evidence under ER 404(b) to show motive and res gestae. The State's theory was that Anthony was a high ranking member of the RSP gang, a "shot caller" who "doesn't want to get his hands dirty." Thus, the State argued, Anthony was not just present at the scene; he accompanied Velia to ensure she carried out the assault. The State further asserted that "[y]ou can't prove the actions of either Velia nor of Anthony, Jr. without allowing the State, through res gestae, through bias, through motive, to explain to a jury how snitching is so instrumentally important to a gang to snuff that out."

After hearing several days of testimony on the gang aggravator and ER 404(b), the trial court found by a preponderance of the evidence that the RSP gang exists and that both Anthony and Velia are members of the gang. Their father, Anthony Archuleta Sr., is known to be the leader of the gang. The trial court found that Anthony is one of the leaders of the gang in his father's absence.

However, the trial court denied the gang aggravator, concluding, "I cannot find the required nexus between the crime and the gang in these particular circumstances." The trial court reasoned that retaliating against Rodriguez was not necessarily

2

consistent with a gang-related motive, because she is not a member of the RSP gang. The court also found no evidence that the reputation of the gang was enhanced by the alleged burglary.

But, the trial court went on to explain that the "nexus required for the aggravator is different than the nexus required for [ER] 404(b)." Therefore, the trial court admitted gang evidence "for the purposes of res gestae." The court recognized that "it would be important to the honor of a gang whether or not somebody accuses a gang member of being a snitch." The court further reasoned that gang evidence was the only way the State could argue its theory of the case—it was "the only way to explain the conduct of Mr. Archuleta, Jr." The court found the gang evidence to be prejudicial, but also probative and "relevant to prove this particular crime under these circumstances, in particular the intent of Mr. Archuleta." The court limited admissible gang evidence "to establishing the gang membership and to testimony about delegation and limited testimony about how gangs operate."

At trial, Rodriguez testified that she began dating Archuleta Sr. in 2010. Rodriguez got to know Anthony and Velia and considered them to be like family. However, by August 5, 2011, Rodriguez was no longer in a relationship with Archuleta Sr.

Rodriguez testified that on the evening of August 5, 2011, she was in the living room of the apartment she shared with her mother, son, and daughter. Rodriguez's mother was in the bedroom, her son was taking a bath, and her daughter was out for the evening. The front door was open, because it was hot that night.

3

Rodriguez explained that around 10:00 p.m., she heard people coming up the stairs and heard Anthony ask, "[W]here is Vanessa?"[2] Velia and Anthony then entered Rodriguez's apartment without her permission. Rodriguez recalled that Velia "just came towards me, you calling us a snitch, you know, what the fuck, you know." She testified that Velia pushed her against the wall and punched her in the face about 20 times, repeating "what the fuck, why you calling us a snitch. We ain't a snitch. RSP ain't no snitch."

Rodriguez explained that while Velia punched her, Anthony stood behind the couch, saying "over and over, what the fuck, you know, you calling us a snitch." She remembered that Anthony was "in a rage" and she "had never seen him like that before." Rodriguez said that Anthony neither tried to stop Velia nor told Velia to continue—"He just looked like on attack mode, like he wanted to do something, but he didn't."

Rodriguez's mother, Esmeralda Cervantez, also testified at trial. Cervantez explained that she eventually came out of her room and saw Anthony standing behind the couch, while Velia held Rodriguez's hair and punched her in the face. Cervantez testified that Anthony "looked really mad" and was saying to Rodriguez, "[W]hy'd you call us a snitch, and why are you calling us a snitch." She recalled that "Velia kept repeating the same thing," as well. Cervantez testified that Anthony and Velia repeated the same phrase about 10 times. Cervantez remembered looking at the clock during

---

[2] Rodriguez initially testified that Velia and Anthony showed up at her apartment around 10:00 p.m. She had previously claimed, though, that they arrived around 9:30 p.m. or 9:45 p.m. However, evidence was introduced that Rodriguez posted on Facebook at 10:48 p.m., which she claimed was only 5 to 10 minutes after they left.

the assault and believed it was around 9:25 p.m. Velia and Anthony left Rodriguez's apartment after about 10 minutes.

Several people at trial testified to Velia's and Anthony's gang affiliation. Rodriguez explained that Archuleta Sr. is the head of the RSP gang, and that Anthony and Velia are members of the same gang. Cervantez also confirmed that Velia and Anthony claimed to be members of the RSP gang. Officer Michael Ashbaugh, who investigated the burglary, testified that both Velia and Anthony are "documented" members of the RSP gang. He explained that Anthony is the highest ranking member of the gang next to his father.

The State also introduced testimony from Officer Brian O'Neill, a gang intelligence officer for the City of Auburn. O'Neill explained that a criminal street gang is a group of three or more members that shares common signs and symbols, whose purpose is criminal activity. He testified that there are 13 criteria the Auburn Police Department uses to validate gang members. These include identifying as a gang member, using a gang nickname or moniker, having gang tattoos, tagging gang symbols, wearing gang clothing, associating with gang members, and targeting rival gang members.

O'Neill then testified that Velia and Anthony are validated members of the Rancho San Pedro 3rd Street Surenos gang under these criteria. He explained that Velia's gang moniker is Gata and Anthony's is Duke. He further testified that Archuleta Sr. is the leader of the gang and Anthony is the de facto leader in his father's absence. O'Neill believed Velia to be a lower ranking member of the gang.

O'Neill further opined that he believed Anthony to be a "shot caller" in the RSP gang. "Shot callers" are higher ranking gang members who have power within the gang to direct lower ranking members to do the gang's "dirty work." O'Neill testified that shot callers will sometimes accompany or supervise junior gang members in carrying out an ordered task, but will not participate. During direct examination, the State asked Officer O'Neill, "[A]s a shot caller, in your opinion, could Anthony Archuleta, Jr. do this kind of behavior in the RSP gang?" When O'Neill answered yes, defense counsel objected and moved to strike. The trial court sustained and struck the testimony.

O'Neill next testified that snitching is particularly offensive to gang members and considered an egregious act that is "treated very harshly." This is so, he explained, because snitching is a "blow to their honor, it's a blow to their machismo, it endangers the gang's existence and it must be dealt with." Snitching is therefore responded to with violence. However, O'Neill admitted that snitching is also generally frowned upon, unrelated to and outside of gang membership.

Velia and Anthony asserted an alibi defense at trial. Their mother, Fofo Terese Tuilefano, testified that she visited them from Denver between August 4 and August 8, 2011. She recalled that on the night of August 5th, she and Anthony picked Velia up from work around 9:30 p.m. The three of them then went to the Auburn Walmart so Velia could cash her paycheck. When the store declined to cash the check, they went to the Federal Way Walmart to try again. Tuilefano testified that they then went to a drive-through Mexican restaurant before going to Velia's apartment for the rest of the evening. The defense introduced a surveillance video showing Velia at the Federal Way Walmart between 9:53 p.m. and 10:07 p.m. Velia's supervisor testified that Velia

was at work until 9:45 p.m. or 10:00 p.m. while she waited for her mother and Anthony to pick her up.

Related to gang evidence, the jury was instructed:

> Certain evidence has been admitted in this case for only a limited purpose. This evidence consists of an allegation that the defendant is a member of a criminal street gang, and that his or her actions were motivated by his or her membership in that gang. This evidence may be considered by you only for the purpose of considering the issue of intent or motive, if any, the defendant may have had to commit the crime charged. You may not consider it for any other purpose. Any discussion of the evidence during your deliberations must be consistent with this limitation.

In closing, the State argued that Anthony and Velia entered Rodriguez's apartment with the intent to beat her up for calling them snitches. As members of the RSP gang, the State emphasized, Anthony and Velia needed to "combat snitching" and "[s]tamp it out, even to people they consider friends, family." The State continued, "That's why you had such a high ranking member of the gang escort Velia Archuleta, to assure that the assault was carried out against Vanessa Rodriguez, to assure that it was done in accordance [with] Rancho San Pedro and their belief that snitching should be stamped out." The State argued that Anthony's role as a shot caller in the gang showed he was not just present at the scene—he was there to make sure the job was carried out and nothing went wrong.

The jury found both Anthony and Velia guilty as charged. Anthony appeals, challenging the trial court's admission of gang evidence.

DISCUSSION

I.  ER 404(b) Gang Evidence

Anthony argues that the trial court erred in admitting gang evidence under ER 404(b) after finding no nexus between the crime and his gang affiliation. He contends that evidence of his gang membership did not complete the story of the crime or provide context for the assault.

We review ER 404(b) rulings for abuse of discretion. State v. Embry, 171 Wn. App. 714, 731, 287 P.3d 648 (2012), review denied, 177 Wn.2d 1005, 300 P.3d 416 (2013). A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. Id. at 731-32.

ER 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

ER 404(b) is not designed to deprive the State of relevant evidence necessary to establish an essential element of its case. State v. Mee, 168 Wn. App. 144, 154, 275 P.3d 1192, review denied, 175 Wn.2d 1011, 287 P.3d 594 (2012). Rather, it is meant to prevent the State from suggesting that a defendant is guilty because he or she is a criminal-type person who would be likely to commit the crime charged. Id.

Evidence of gang affiliation falls within the scope of ER 404(b) and is considered prejudicial. Embry, 171 Wn. App. at 732. However, courts have properly admitted gang affiliation evidence to show motive, intent, res gestae, or that the defendants were acting in concert. See, e.g., State v. Scott, 151 Wn. App. 520, 527, 213 P.2d 71 (2009);

State v. Yarbrough, 151 Wn. App. 66, 86-87, 210 P.3d 1029 (2009); State v. Boot, 89 Wn. App. 780, 790, 950 P.2d 964 (1998); State v. Campbell, 78 Wn. App. 813, 822-23, 901 P.2d 1050 (1995). To do so, there must be a connection between the gang's purposes or values and the offense committed. Scott, 151 Wn. App. at 527. Gang evidence is often elicited through the expert testimony of police officers familiar with gang culture and structure. See, e.g., Embry, 171 Wn. App. at 729, 733-34; Yarbrough, 151 Wn. App. at 79-80; Campbell, 78 Wn. App. at 818, 823.

> A person is an accomplice to a crime if,
>    (a) With knowledge that it will promote or facilitate the commission of the crime, he or she:
>
>    (i)    Solicits, commands, encourages, or requests such other person to commit it; or
>
>    (ii)   (ii) Aids or agrees to aid such other person in planning or committing it.

RCW 9A.08.020(3). A person is guilty of first degree burglary if,

> with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building and if, in entering or while in the building or in immediate flight therefrom, the actor or another participant in the crime (a) is armed with a deadly weapon, or (b) assaults any person.

RCW 9A.52.020(1). An accomplice bears the same criminal responsibility as a principal. State v. Hoffman, 116 Wn.2d 51, 104, 804 P.2d 577 (1991).

To be an accomplice to a crime, the defendant must associate himself with the undertaking, participate in it as something he desires to bring about, and seek by his actions to make it succeed. In re Welfare of Wilson, 91 Wn.2d 487, 491-92, 588 P.2d 1161 (1979). Mere assent is not enough to make someone an accomplice. Id. at 491. Nor is presence at the scene of the crime sufficient, even when coupled with the

9

knowledge that presence aids in commission of the crime. State v. Rotunno, 95 Wn.2d 931, 933, 631 P.2d 951 (1981). For presence to rise to the level of complicity, the defendant must be ready to assist in the commission of the crime. Wilson, 91 Wn.2d at 491.

Rodriguez testified that she heard people coming up the stairs and heard Anthony ask where she was. Both Anthony and Velia then entered Rodriguez's apartment without her permission. She remembered that Anthony was "in a rage" and looked like he was "on attack mode, like he wanted to do something, but he didn't." Though Anthony stood behind the couch while Velia assaulted Rodriguez, he said "over and over, what the fuck, you know, you calling us a snitch." Rodriguez remembered Velia also shouted at her, "[W]hat the fuck, why you calling us a snitch. We ain't a snitch." Rodriguez testified that Velia referenced the gang, saying, "RSP ain't no snitch." Cervantez likewise testified that Anthony stood behind the couch, but "looked really mad" and said, "[W]hy'd you call us a snitch, and why are you calling us a snitch?" She estimated that Anthony and Velia repeated the same phrase about 10 times during the encounter. Both Rodriguez and Cervantez testified that Anthony and Velia identified as members of the RSP gang. This evidence was properly admitted to complete the story of the crime and to explain motive.

The testimony established Anthony's active role in the assault was established. Velia and Anthony's gang membership was not in doubt. The importance of snitching to Velia and Anthony was not in doubt. In light of their testimony, some of the additional gang evidence was clearly relevant and admissible to contextualize Velia's statement,

"RSP ain't no snitch." For the same reason, it was not necessary, as Anthony argues, that Rodriguez be a member of a gang for the evidence to be relevant as to motive.

Nonetheless, Archuleta objects to Officer O'Neill's gang affiliation testimony. Officer O'Neill's testimony about Anthony's status as a shot caller allowed the prosecutor to argue that the jury could infer that Anthony's presence was an act of supervision establishing guilt as an accomplice. However, the testimony of Rodriguez and Cervantez establishing Anthony's active role made any such inference surplusage.

Even if we assume that all of the police testimony about gang culture and structure was admitted in violation of ER 404(b), the error was harmless. ER 404(b) errors are not of constitutional magnitude. State v. Jackson, 102 Wn.2d 689, 695, 689 P.2d 76 (1984). We therefore analyze erroneous admission of ER 404(b) evidence under the lesser standard for nonconstitutional error. State v. Gresham, 173 Wn.2d 405, 433, 269 P.3d 207 (2012). Under this standard, the error is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred. State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997). After excluding Officer O'Neill's gang testimony, the evidence as a whole demonstrated that Anthony was not merely present, but rather was ready to assist and participated verbally.

We do not find that, within reasonable possibilities, the outcome of the trial would have been different. We hold that any error was harmless.

## II.   Gang Evidence Invading the Province of the Jury

Anthony further asserts that police testimony regarding his gang membership and role as a shot caller was improperly introduced to prove an element of the crime

and thereby invaded the province of the jury under United States v. Mejia, 545 F.3d 179 (2d Cir. 2008). Anthony contends that gang membership cannot serve as proof of accomplice liability.

Police testimony has been routinely admitted in Washington to explain gang terminology, gang codes of conduct and discipline of violators, and gang structure. See, e.g., Embry, 171 Wn. App. at 729, 733-34; Yarbrough, 151 Wn. App. at 86-87; Campbell, 78 Wn. App. at 823. Such evidence assists the trier of fact in understanding the State's theory of the case. Campbell, 78 Wn. App. at 823. This is precisely what Officer O'Neill testified to here. When he was asked whether Anthony was acting as a shot caller during this particular incident, defense counsel objected and the answer was stricken.

In Mejia, a police officer testified that the defendants' gang, MS-13, needed guns "'to do what MS 13 does, which is, you know, shoot at rival gang members, and sometimes in the process, obviously, some people get hit.'" 545 F.3d at 187. The officer further testified that the MS-13 gang, as a whole, had committed between 18 and 23 murders in the area in recent years. Id. The Second Circuit held that this testimony went too far under the Federal Rules of Evidence 702. Id. at 194-96.

The officer's testimony in Mejia is precisely the type of propensity evidence that ER 404(b) is designed to exclude. It is distinguishable from Officer O'Neill's testimony here, which went to gang mores and hierarchy. Indeed, the Second Circuit distinguished the officer's impermissible propensity testimony from his admissible testimony about gang mores, symbols, jargon, and internal structure. See id. at 190.

Anthony's citation to <u>Mitchell v. Prunty</u>, 107 F.3d 1337 (9th Cir. 1997), is likewise unpersuasive here. The <u>Mitchell</u> court stated that gang membership alone cannot serve as proof of intent to aid or abet a crime. <u>Id.</u> at 1342. Otherwise, any gang member could be held liable for another gang member's crime when the crime is predicated on the common purpose of fighting the enemy. <u>Id.</u> Here, the State did not merely rely on Anthony's gang membership to argue that he was an accomplice—but also gang hierarchy and gang mores.

We hold that Officer O'Neill's testimony did not invade the province of the jury. We affirm.

WE CONCUR: