

2015 JUL 27  AM 10: 3..

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72205-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| KEVIN DAVID DILTZ, | ) | |
| | ) | |
| Appellant. | ) | FILED: July 27, 2015 |

SCHINDLER, J. — Kevin David Diltz seeks reversal of the jury conviction for assault in the first degree of a law enforcement officer while armed with a firearm. Diltz contends the court erred in denying his motion for a mistrial based on two prejudicial statements during rebuttal argument. Because the statements were based on reasonable inferences from the evidence and were related to the State's burden to prove intent, we affirm the decision to deny the motion for a mistrial.

## FACTS

At around 11:30 a.m. on April 29, 2013, Marysville Police Department Officer Jeffrey Norris pulled over a black pickup truck on the onramp to southbound Interstate 5 (I-5). As Officer Norris approached the truck, the driver, later identified as Kevin David Diltz, drove southbound on I-5. Officer Norris ran back to his patrol car and followed the

truck. As Diltz drove southbound on State Route 529, he passed a number of cars on the right-hand shoulder, often reaching speeds of 95 m.p.h.

Diltz slowed down when he reached Everett but drove through a number of red traffic lights and stop signs. After the truck's driveline fell off, Diltz jumped out of the truck. The truck crashed into a parked vehicle, and Diltz started running through a residential neighborhood. Officer Norris got out of his patrol car and yelled, "Stop. Police," but Diltz kept running. Officer Norris ran after him.

While Diltz was running downhill along a sidewalk, he turned to look back at Officer Norris and fired at least four shots. Diltz then ran behind a house and jumped over a fence into a neighboring backyard. Officer Norris called dispatch to report shots had been fired and request backup.

Marysville Police Department Officer Daniel Vinson stationed himself at a nearby intersection while other officers set up a perimeter. Officer Vinson saw Diltz running down an alley and pointed a rifle at him. Diltz raised his hands but then turned and ran. Everett Police Department Officer Alex Soderstrom saw Diltz run out of the alley and across a street. Officer Soderstrom pointed a rifle at Diltz and told him to stop but Diltz kept running.

Everett Police Department Officer Shane Nelson spotted Diltz running between two houses. Officer Nelson pointed his rifle at Diltz and threatened to shoot him if he did not get on the ground. Diltz walked directly toward Officer Nelson with his fists balled. Diltz had a large knife on his hip but did not appear to have a gun. The police arrested Diltz.

After his arrest, the police found a brown jacket containing a cell phone in the alley and a pair of gloves in one of the backyards but did not find the firearm Diltz used to

2

shoot at Officer Norris. A police officer identified three bullet strikes on the concrete sidewalk where Diltz fired at Officer Norris. The officer also found three 9 mm hollow-point bullet shell casings. A few days later, a homeowner found a fourth 9 mm shell casing in a nearby front yard.

Detective Steve Brenneman obtained a warrant to search the black pickup truck. Inside, he found an empty gun case, a small canvas bag containing a pipe, and a pair of vice grips and a screwdriver. A Washington State Patrol Crime Laboratory (WSPCL) forensic scientist extracted DNA[1] from the pipe found in the truck and the pair of gloves. The DNA from the pipe and the gloves matched the DNA from Diltz with a "1 in 3.4 quintillion" probability of a random match.

Detective Brenneman also obtained a warrant to search the cell phone found in the jacket. The search history showed two searches on the evening of April 28 for a Ruger P89 handgun.

On May 17, the State charged Diltz with assault in the first degree and the aggravating factor of committing the assault against a law enforcement officer while armed with a firearm. The State also charged Diltz with attempting to elude a pursuing police vehicle and the aggravating factor of threatening persons other than the defendant or the pursuing officer with physical injury or harm.

On May 28, Detective Brenneman listened to recorded phone calls Diltz made from jail. During a conversation on May 15, Diltz told a friend, "I just want somebody to go get that fuckin' thing so I don't have to worry about it." On May 22, Diltz told his friend, "[A]t least you tried right?" The friend answered, "I did I even went back and tried again." In response, Diltz said, "I mean it's over with . . . . I should have just went out fuckin'

---

[1] Deoxyribonucleic acid.

3

blasting at 'em like I wanted to . . . then I wouldn't be here."[2] Later in the conversation, Diltz said, "I'm pretty pissed off, but then again I only got me to be mad at, maybe I shoulda hid it better."

The next day, Detective Brenneman went back to the Everett neighborhood with a metal detector and "almost immediately" found the gun in the backyard where the pair of gloves with Diltz's DNA had been found. The Ruger model P89 9 mm semiautomatic pistol was buried under several inches of mulch. The hammer of the gun was cocked back with one live round in the chamber, but the gun was jammed. A WSPCL forensic scientist determined that all four of the 9 mm hollow-point bullet shell casings had been fired from the Ruger P89 pistol.

On July 26, the State charged Diltz by amended information with additional counts of possession of a stolen firearm, possession of a stolen vehicle, and unlawful possession of a firearm in the second degree.

A number of witnesses testified during the four day trial, including the owner of the stolen black pickup truck, the owner of the stolen Ruger P89 pistol, Everett Police Department Detective Joseph Klingman, Detective Brenneman, Officer Norris, and WSPCL forensic scientists. The court admitted into evidence over 200 exhibits, including the gun, the four shell casings, the gloves found in the backyard, and a number of maps and photographs. Without objection, the court admitted into evidence excerpts of the recorded jail phone conversations.

Detective Brenneman testified he and Officer Norris returned about a week later to determine the location of Officer Norris and Diltz when Diltz fired the gun. Detective Klingman testified that the location of the four 9 mm shell casings was consistent with

_____

[2] Some alterations in original.

4

where Officer Norris said Diltz was standing when Diltz pulled the trigger. Detective Brenneman and Detective Klingman used digital crime scene reconstruction software to determine how close the bullets were to Officer Norris when they struck the sidewalk. The Detectives testified that one of the bullets struck the concrete sidewalk approximately 19 feet from Officer Norris. The other two bullet strikes were approximately 72 and 73 feet from Officer Norris.

Detective Klingman testified that Officer Norris was uphill from Diltz at the time of the shooting and the difference in elevation between Diltz and Officer Norris was approximately three feet. Detective Brenneman testified that because Diltz was three feet lower than Officer Norris when he pulled the trigger, "the height difference would account for why those rounds may not have hit Officer Norris."

Forensic consultant Matthew Noedel testified on behalf of the defense. Noedel testified that in his opinion, Diltz must have fired the gun toward the ground rather than straight at Officer Norris. Noedel said that where 90 degrees represents pointing straight down and 0 degrees represents pointing directly horizontal, he believed that Diltz held the gun between 10 and 60 degrees while shooting. However, on cross-examination, Noedel admitted he did not take into account the slope of the sidewalk or the difference in elevation in reaching his conclusion. Noedel also admitted a 9 mm hollow-point bullet could kill a person and if a 9 mm hollow-point bullet hit "a vital area" of a person's body, "I would expect it to be fatal or cause great harm."

The court instructed the jury on assault in the first degree and, at the request of defense, the lesser-included crime of assault in the second degree.

In closing argument, the defense attorney conceded the State met its burden of

proving possession of a stolen vehicle, attempting to elude, and unlawful possession of a firearm. However, the defense argued the State did not prove Diltz knew the gun was stolen.

In addressing the charge of assault in the first degree, the defense attorney admitted Diltz shot the gun but argued he fired only "toward the ground" and not directly at Officer Norris. The attorney argued Diltz was just trying to escape and "did not try or intend to hit Officer Norris with a bullet." The defense attorney argued that because the State did not prove Diltz intended to inflict great bodily injury, the jury should convict him of the lesser-included crime of assault in the second degree.

In rebuttal, the State argued the evidence showed Diltz acted with intent to cause Officer Norris great bodily injury. First, the prosecutor pointed to the evidence that Diltz grabbed the gun and a 15-round magazine before jumping out the moving pickup truck. The State argued, in pertinent part:

> When [Diltz] bails out of the car, what does he have? A gun. He arms himself. He is getting ready. There's a gun case that he left in the car. He didn't leave the gun in the gun case. . . .
>
> . . . .
> He didn't grab the 10-round clip. He grabbed the 15-round clip. More ammo, more hollow-point bullets. Shows you what he was intending to do.

Second, the State argued that the recorded phone calls from jail demonstrated Diltz's intent. The State argued, in pertinent part:

> I think the most critical piece of information comes from the defendant himself. You heard those recorded phone calls. You heard him say, and I quote, "I should have just went out fucking blasting at them like I wanted to."
>
> . . . .
> That shows you his intent, what he wanted to do. He wanted to kill as many cops, specifically Officer Norris, on that day as he could. That's what he wanted.

The State also argued the evidence did not support the defense theory that Diltz fired only "warning shots." The State asserted that if Diltz "wanted to just send a warning," he "could have shot in the air" or "into the grass to the side of him." The State argued, in pertinent part:

> You don't fire warning shots. You don't. You shoot to kill. Do you fire warning shots into the air? Into the ground? You don't fire them at all. But if you do, that's what you do. And you fire one. You don't fire at least four. There is no reasonable explanation why you would fire multiple shots at or [in] the direction of an officer unless you intended to hit them.

The State pointed out that the central issue for the jury to decide was Diltz's intent when he pulled the trigger, not his motivation.

> That's the one issue you have to decide in this case. The time [Diltz] took that gun, the time he fired it at Officer Norris, and what was his intent. Not what was his motivation behind it, was he trying to flee, was he trying to become a notorious cop killer. What was his intent when he shot at Officer Norris?

The defense did not object to the prosecutor's rebuttal argument.

The jury found Diltz not guilty of possessing a stolen firearm. The jury found Diltz guilty of assault in the first degree, attempting to elude a pursuing police vehicle, possession of a stolen vehicle, and unlawful possession of a firearm in the second degree. The jury returned special verdicts finding Diltz committed the crime of assault in the first degree against a law enforcement officer while armed with a firearm, and individuals other than Diltz and Officer Norris were threatened with physical injury or harm by Diltz's actions in attempting to elude.

The defense filed a motion for a mistrial, arguing the prosecutor's statements that Diltz intended "to kill as many cops . . . as he could" and that his motive was "to become a notorious cop killer" were improper and prejudicial.

The court denied the motion. The court ruled the prosecutor's statements were

based on reasonable inferences from the evidence. The court found the statement that Diltz intended to kill as many cops as he could was "a reasonable inference from the evidence presented at trial and was directly relevant to the defendant's intent when firing the gun in [O]fficer Norris' direction." The court also found the argument that the jury must decide intent and "the [S]tate did NOT have to prove the defendant's motivation" was to become a notorious cop killer was "also relevant to the State's burden to prove intent and the difference between intent and the motive behind the intent."

Based on an offender score of 13 and the aggravating factors, the court imposed an exceptional sentence for the conviction of assault in the first degree and a high-end standard-range sentence for attempting to elude to run consecutively.

## ANALYSIS

Diltz contends the court erred in denying his motion for a mistrial based on the two prejudicial statements the prosecutor made during rebuttal argument. Diltz asserts the statements that Diltz wanted to kill as many police officers as he could and that the State did not have to prove his motive were an improper appeal to the passion and prejudice of the jurors that require reversal of his conviction for assault in the first degree.

Where, as in this case, alleged prosecutorial misconduct has been the subject of a mistrial motion, we review the trial court's decision to deny the motion for abuse of discretion. State v. Lindsay, 180 Wn.2d 423, 430, 326 P.3d 125 (2014); State v. Rodriguez, 146 Wn.2d 260, 269, 45 P.3d 541 (2002). The court abuses its discretion only " 'when no reasonable judge would have reached the same conclusion.' " State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012) (quoting State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)). We give deference to the trial court's ruling because it is in the best position to evaluate whether the prosecutor's comments prejudiced the

defendant. State v. Gregory, 158 Wn.2d 759, 841, 147 P.3d 1201 (2006). "The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." Emery, 174 Wn.2d at 765.

To establish prosecutorial misconduct, Diltz must show the statements made by the prosecutor during rebuttal were both improper and prejudicial. Lindsay, 180 Wn.2d at 440. We consider an allegedly improper statement in the context of the argument as a whole, the issues in the case, the evidence, and the jury instructions. State v. Russell, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994).

The State has wide latitude to make arguments based on reasonable inferences from the evidence. State v. Thorgerson, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). But a prosecutor commits misconduct by asking the jury to convict based on their emotions rather than the evidence. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (citing AM. BAR ASS'N, STANDARDS FOR CRIMINAL JUSTICE std. 3-5.8(c) (2d ed. 1980)); State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) ("References to evidence outside of the record and bald appeals to passion and prejudice constitute misconduct."). During rebuttal, a prosecutor "is entitled to make a fair response to the arguments of defense counsel." State v. Brown, 132 Wn.2d 529, 566, 940 P.2d 546 (1997).

Here, the defense conceded Diltz fired the gun. The parties disputed his intent when he fired at least four shots from a semiautomatic weapon. The State argued he was guilty of assault in the first degree. The defense argued Diltz was guilty of the lesser-included crime of assault in the second degree.

During closing argument, the defense argued the State did not prove Diltz

9

intended to inflict great bodily harm. The defense claimed that because Diltz's motive was to flee, he only intended to fire warning shots.

Diltz contends the prosecutor committed reversible misconduct by arguing that Diltz intended "to kill as many cops . . . as he could" and that the State did not have to prove his motive was "to become a notorious cop killer."

The court denied the motion for a mistrial, finding the statements were based on reasonable inferences from the evidence, relevant to the State's burden to prove intent, and not flagrant or ill intentioned. The court's findings state, in pertinent part:

1. As part of the First Degree Assault charge in this case, the State was required to prove that the defendant intended to cause Officer Norris great bodily harm, a term that includes bodily injury that creates a probability of death.
2. Evidence and arguments derived from that evidence, related to what the defendant was thinking at the time he fired a gun at Officer Norris were relevant and admissible to prove the defendant's intent.
3. During trial, the jury heard a recorded phone call made by the defendant in which he said, "I should have just went out fucking blasting at 'em like I wanted to" when discussing the incident involving Officer Norris.
4. There was also evidence presented at trial that the defendant fired in the direction of Officer Norris at least 3-4 times and, when told he needed to stop or would be shot, the defendant laid down on the ground.
5. The State's argument that the defendant "wanted to kill as many cops, specifically Officer Norris, on that day as he could" was a reasonable inference from the evidence presented at trial and was directly relevant to the defendant's intent when firing the gun in [O]fficer Norris' direction.
6. The State's argument that the [S]tate did NOT have to prove the defendant's motivation behind his intent "Not what was his motivation behind it, was he trying to flee, was he trying to become a notorious cop killer? What was his intent when he shot at Officer Norris" was also relevant to the State's burden to prove intent and the difference between intent and the motive behind the intent.
7. Neither of the above statements were any more inflammatory than the evidence that was presented at trial and neither were flagrant or ill intentioned.

The record supports the court's finding that the prosecutor's argument that Diltz

10

"wanted to kill as many cops, specifically Officer Norris, on that day as he could" was based on reasonable inferences from the evidence at trial. The evidence showed that in order to have more ammunition, Diltz chose to take the 15-round magazine instead of the 10-round magazine when he grabbed the gun and jumped out of the moving truck. The testimony and forensic evidence showed Diltz fired the gun at least four times in the direction of Officer Norris. And, without objection, the State presented the recording of the phone call from jail where Diltz said he wanted to "just [go] out fuckin' blasting at 'em."

The record supports the court's finding that the prosecutor's argument that the State "did NOT have to prove" Diltz's motive, including whether he was "trying to flee" or "trying to become a notorious cop killer," was not improper or inflammatory. The distinction between intent and motive was particularly important because the defense argued the State did not prove Diltz intended to inflict great bodily harm because his motive was simply to get away.[3] And as the court points out, the statement was "relevant to the State's burden to prove intent and the difference between intent and the motive behind the intent." See State v. Boot, 89 Wn. App. 780, 789, 950 P.2d 964 (1998) (the State is not required to prove motive as an essential element of the crime).

The cases Diltz relies on are inapposite. See Russell, 125 Wn.2d at 87-89 (prosecutor's argument that the defendant would go to another state and kill again if acquitted was speculative and not based on the evidence); State v. Pierce, 169 Wn. App. 533, 537, 280 P.3d 1158 (2012) (prosecutor committed reversible misconduct by "fabricating an emotionally charged story of how the victims might have struggled" and speculating on the defendant's "thought

---

[3] In addition, the jury instructions specifically state that the jury is to "act impartially," to "not let your emotions overcome your rational thought process," and to "disregard any remark, statement, or argument that is not supported by the evidence or the law in [the court's] instructions."

process leading up to the crime" because the statements were based on evidence outside of the record); Campbell v. State, 679 So.2d 720, 724, 21 Fla. L. Weekly S287 (1996) (prosecutor's reference to "cop-killers" was improper where neither victim was a police officer and no officers were present at the time of the charged crimes); Williams v. State, 324 S.E.2d 544, 544, 172 Ga. App. 682 (1984) (prosecutor's reference to "two specific instances" of police officers being killed was improper because it was unrelated to the defendant and based on evidence outside the record); People v. Brooks, 573 N.E.2d 1306, 1313-14, 214 Ill.App.3d 531 (1991) (prosecutor's statement that "an officer was just killed two weeks ago" was "clearly improper" because it was unrelated to the defendant and based on evidence outside of the record).

We affirm denial of the motion for a mistrial.

WE CONCUR: